# UNITED STATES DISTRICT COURT

for the
Central District of California

(UNDER SEAL)

In the Matter of the Search of                )
*(Briefly describe the property to be searched or identify the* )     Case No. 8:21-MJ-00563
*person by name and address)*                  )
                                               )
The residence located at 18611 Ervin Lane, Santa )
Ana, CA, 92705                                 )
                                               )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 111(a)(1), § 2 and (b) | Assaulting, Resisting or Impeding Officers and Aiding and Abetting |
| 18 U.S.C. § 231(a)(3), § 2 | Civil Disorders and Aiding and Abetting |
| 18 U.S.C. § 1752(a)(1) | Entering and Remaining on Restricted Buildings or Grounds |
| 40 U.S.C. § 5104(e)(2) | Violent Entry or Disorderly Conduct |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Jessica Salo
_____
*Applicant's signature*

Jessica Salo, Special Agent (FBI)
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Santa Ana, CA</u>          Douglas F. McCormick, U.S. Magistrate Judge
                                             _____
                                             *Printed name and title*

AUSA: Paul C. LeBlanc (213) 393-6933

## **AFFIDAVIT**

I, Jessica Salo, being duly sworn, declare and state as follows:

### I.   **INTRODUCTION**

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since November 2014.  I am currently assigned to the Orange County Joint Terrorism Task Force.  My duties include investigating violations of the laws of the United States, specifically investigations related to domestic and foreign terrorism.  As a Special Agent, I have received both formal and informal training from the FBI regarding domestic and foreign terrorism investigations.

2.    Through my training and experience with the FBI, I am familiar with the methods of operation that individuals associated with domestic and foreign terrorist organizations employ – including their use of social media and online platforms such as Facebook, Instagram, and YouTube – to communicate with associates regarding their ideology, to organize actions on behalf of their organizations, and to bring attention to their political and social agendas.  As an FBI Special Agent, I have also participated in the execution of multiple search warrants, including federal search warrants executed at physical residences in cases involving domestic terrorism.

## II. **PURPOSE OF AFFIDAVIT**

3.    This affidavit is made in support of warrants to search: (1) 18611 Ervin Lane, Santa Ana, CA, 92705 (the "SUBJECT RESIDENCE"), as described more fully in Attachment A-1, which is incorporated herein by reference; (2) the person of Jeffery Scott Brown ("BROWN"), as described more fully in Attachment A-2, which is incorporated herein by reference; and (3) a gray 2021 Toyota Tacoma bearing California license plate number 89438C3 ("SUBJECT VEHICLE"), as described more fully in Attachment A-3, which is incorporated herein by reference, for evidence, fruits, and instrumentalities of violations of the following statutes, as described more fully in Attachment B, which is also incorporated herein by reference: 18 U.S.C. § 111(a)(1), § 2 and (b) (Assaulting, Resisting or Impeding Officers and Aiding and Abetting); 18 U.S.C. § 231(a)(3), § 2 (Civil Disorders and Aiding and Abetting); 18 U.S.C. § 1752(a)(1) (Entering and Remaining on Restricted Buildings or Grounds); and 40 U.S.C. § 5104(e)(2) (Violent Entry or Disorderly Conduct) (collectively, the "Subject Offenses").

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are

related in substance and in part only and all dates and times
are approximate.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

5.   On January 6, 2021, BROWN was part of a violent mob
that rioted at the United States Capitol in Washington D.C.
while a joint session of Congress met to certify the results of
the 2020 Presidential Election.

6.   BROWN, an Orange County resident, was captured in U.S.
Capitol CCTV footage inside the Lower West Terrace tunnel of the
Capitol building on January 6, 2021.  This footage shows BROWN
pointing a can of pepper or similar chemical spray towards a
police defensive line and deploying the spray for several
seconds in the direction of the police, who were attempting to
restrict access to the U.S. Capitol through the exterior door to
the lower west terrace.  The footage also shows BROWN at the
front of the crowd of rioters in the tunnel, participating in
the pushing action against officers.  During this time, a
Metropolitan Police Department Officer ("Officer Victim 1") was
at the front of the line of officers.  This officer was being
pressed between the crowd of rioters and the line of officers.
His gas mask was ripped off by another individual and blood can
be seen in his mouth.

7.   On August 16, 2021, the Honorable Zia M. Faruqui,
United States Magistrate Judge in the District of Columbia,
issued a criminal complaint and arrest warrant charging BROWN
with 18 U.S.C. § 111(a) and (b) (Assaulting, Resisting or
Impeding Federal Officers); 18 U.S.C. § 231(a)(3) (Civil

Disorder); 18 U.S.C. § 1752(a)(1), (2) and (4) (Entering and Remaining on Restricted Buildings or Grounds); and 40 U.S.C. § 5104(e)(2)(D), (E), (F) and (G) (Violent Entry or Disorderly Conduct).  The criminal complaint, arrest warrant, and affidavit in support thereof are attached hereto as Exhibit A and incorporated herein by reference.

8.    As detailed below, there is probable cause to believe that BROWN lives at the SUBJECT RESIDENCE, drives the SUBJECT VEHICLE, and that additional evidence of the Subject Offenses – including items and digital device(s) used by BROWN during the riot at the U.S. Capitol – will be found inside.

### IV.    STATEMENT OF PROBABLE CAUSE

### A.    BROWN's Presence at the Riot

9.    On August 16, 2021, in the District of Columbia, BROWN was charged by complaint (21-MJ-00565) with 18 U.S.C. § 111(a) and (b) (Assaulting, Resisting or Impeding Federal Officers); 18 U.S.C. § 231(a)(3) (Civil Disorder); 18 U.S.C. § 1752(a)(1), (2) and (4) (Entering and Remaining on Restricted Buildings or Grounds); and 40 U.S.C. § 5104(e)(2)(D), (E), (F) and (G) (Violent Entry or Disorderly Conduct).  See Exhibit A.  By way of summary, the affidavit in support of the criminal complaint sets forth the following facts, among others:

a.    On January 6, 2021, between approximately 2:56 p.m. and 3:11 p.m, a man who matches BROWN's description and identified as BOLO172-AFO[1] appeared on U.S. Capitol CCTV footage

---

[1] "BOLO" is an acronym that stands for "Be On the Look Out"; FBI BOLO bulletins associated with suspects are often assigned unique numbers and letters, as here.

in the Lower West Terrace.  After reviewing BROWN's California Department of Motor Vehicles photograph, investigators believe the man to be BROWN. BROWN was wearing a black winter jacket and a black and white winter hat with the Oakley logo.

      b.   The Lower West Terrace Door is an outdoor area on the west side of the U.S. Capitol building. On January 6, 2021, all parts of the Lower West Terrace were considered "restricted grounds" and were not accessible to the public.  The Lower West Terrace Door led into the U.S. Capitol building through a tunnel.

      c.   Between approximately 2:56 p.m. and 3:11 p.m., the Lower West Terrace Door was heavily guarded by U.S. Capitol Police and Metropolitan Police Department personnel, who had formed a defensive line to prevent unauthorized access into the U.S. Capitol via the tunnel.  As BROWN moved into the tunnel, he held a cell phone up in front of his face, in a manner that indicates he was using the phone to record the events in front of him:



        d.    At approximately 3:11 p.m., BROWN can be observed
in the tunnel with a crowd of rioters, wearing the black and
white winter hat depicted in the photographs above and below.
BROWN can be seen towards the front of the group of rioters,
near the police defensive line. BROWN can be seen reaching
through the crowd towards another rioter, who provides BROWN
with what appears to be a can of spray.  At approximately 3:11
p.m., BROWN can be seen pointing the can towards the police
defensive line and deploying the spray for several seconds in
the direction of the police.  Based on our training and
experience, FBI agents assessed this spray was pepper or a
similar chemical spray.



e.    In a YouTube video titled "Scenes of Chaos
Captured Inside US Capitol as Crowd Challenges Police," which
the FBI obtained on May 24, 2021, at approximately 20:05
minutes, a hand can be seen holding and deploying a can of spray
irritant into crowd of officers who are attempting to restrict
access to the U.S. Capitol through the exterior door to the
lower west terrace. The spray is deployed for several seconds.
The individual holding the spray is assessed to be BROWN based
on the similarity in clothing and positioning to the above
photograph.



     f.   At approximately 21:03 minutes, BROWN was at the front of the crowd of rioters in the tunnel, participating in the pushing action against officers who were attempting to restrict access to the U.S. Capitol through the exterior door to the Lower West Terrace.  During this time, Officer Victim 1 was at the front of the line of officers.  This officer was being pressed between the crowd of rioters and the line of officers. His gas mask was ripped off by another individual and blood can be seen in his mouth.

     g.   On February 1, 2021, a U.S. Magistrate Judge in the District of Columbia, signed a federal search warrant for electronic evidence in account(s) associated with Gina Bisignano based on Bisignano's presence inside the U.S. Capitol on January 6, 2021.  Two videos, titled IMG_5082 and IMG_5083, were obtained pursuant to this warrant.  The videos are 7 seconds and

15 seconds long, respectively, and depict the crowd of rioters
in the Lower West Terrace of the U.S. Capitol on January 6,
2021.  In the videos, BROWN was at the front of the crowd
participating in the pushing action against officers who were
attempting to restrict access to the U.S. Capitol through the
exterior door to the Lower West Terrace.  According to metadata,
the videos were created on January 6, 2021.





h.    On July 1, 2021, an FBI agent showed an FBI "seeking information" poster and photographs of BOLO172-AFO to a WITNESS who has known BROWN for approximately four to five years.  The WITNESS identified the individual in BOLO172-AFO as BROWN.

**B.    BROWN Resides at the SUBJECT RESIDENCE and Drives the SUBJECT VEHICLE**

10.    According to California Department of Motor Vehicles records, BROWN resides at 1 League Apt 61074, Irvine, CA, 92602. Based on basic Internet research and my checks with the United States Postal Inspection Service, I know that this address corresponds to a U.S. Postal Office Box and is not an apartment or residence.

11.    On June 4, 2021, the Honorable Zia M Faruqui, U.S. Magistrate Judge for the District of Columbia signed a warrant for the disclosure of prospective cell-site information and GPS

information on telephone number ending in -9487 (21-sc-1904), which is used by BROWN, as detailed below.

      a.  According to Southwest Airlines, BROWN traveled from LAX to IAD (Washington, DC) on January 5, 2021 and returned to LAX on January 7, 2021.  BROWN provided telephone number ending in -9487 and email address jeffbrownXX@XXXXX.com on the reservation.

12.  Using the prospective cell-site information and GPS information for telephone number ending in -9487, on June 21, 2021, I conducted spot checks in the vicinity of 17th St. and Newport Blvd, Tustin, CA to locate BROWN.  At approximately 3:00pm, I located the SUBJECT VEHICLE parked on the street in front of 18611 Ervin Lane, Santa Ana, CA.  "TRUMP WON!" was written on the rear window of the Tacoma in white marker.  This address is described herein and within Attachment A-1 as the SUBJECT RESIDENCE.

13.  On June 23, 2021, I conducted another spot check at the SUBJECT RESIDENCE.  A grey Toyota Tacoma, which was similar in appearance to the SUBJECT VEHICLE, was backed into the driveway of the residence. The Tacoma did not have a front license plate.  Between June 29, 2021 and July 21, 2021, I conducted additional spot checks at the SUBJECT RESIDENCE and saw the SUBJECT VEHICLE backed into the driveway of the residence.

14.  On July 8, 2021, at approximately 9:43 a.m., surveillance observed an individual matching the description of BROWN departed via a side door of the SUBJECT RESIDENCE.  BROWN

was holding a backpack.  BROWN opened and closed the driver's side passenger door then entered the front driver's seat of the SUBJECT VEHICLE.  A few minutes later, the SUBJECT VEHICLE departed the SUBJECT RESIDENCE.  At approximately 7:00pm, the SUBJECT VEHICLE returned to the SUBJECT RESIDENCE.  A few minutes later, BROWN, holding a backpack, appeared to unlock the side door of the SUBJECT RESIDENCE and entered the residence.

15.  On July 9, 2021, at approximately 10:12 a.m., additional surveillance observed BROWN exit the side door of the SUBJECT RESIDENCE with a backpack and walk towards the SUBJECT VEHICLE.  BROWN entered the open garage of the SUBJECT RESIDENCE, retrieved an item, and entered the side door of the SUBJECT RESIDENCE.  The garage door closed.  Approximately one minute later, BROWN departed the SUBJECT RESIDENCE via the same side door, appeared to lock the side door, and walked towards the SUBJECT VEHICLE.  The SUBJECT VEHICLE departed the SUBJECT RESIDENCE a couple of minutes later.  The SUBJECT VEHICLE returned to the SUBJECT RESIDENCE at approximately 2:41 p.m. Two minutes later, BROWN rolled two green trash cans up the driveway of the SUBJECT RESIDENCE, opened a side gate, and deposited the trash cans in the backyard.  BROWN appeared to unlock the side door and entered the SUBJECT RESIDENCE.

### C.    USE OF DIGITAL DEVICES AT THE CAPITOL RIOTS

16.  Based on my training and experience, I know that individuals traveling outside of their cities of residence to attend large events, such as the demonstration on January 6, 2021 in Washington D.C., typically carry their cell phones with

them in order to coordinate their travel plans, use web-based applications to get directions to unfamiliar locations, and communicate with friends and family both at the event and at home.  Furthermore, based on my training and experience, I know that persons who engage in the Subject Offenses will frequently use digital devices, including cell phones, computers, tablets, and other devices, to conduct their criminal activities, take (and store) photographs and videos in order to memorialize their illegal activities, and maintain contact with others involved with the planning, targeting, and execution of the Subject Offenses.

17.  In my training and experience, I know that smart phones are the single most common way in which people now take photographs and instantly share them with others.  As detailed below, in my training and experience, camera and messaging applications on smart phones allow users to take photographs and video- such as those that were taken during the Capitol Riots - and communicate with other users.

18.  Based on my review of public news reports following the events at the U.S. Capitol on January 6, 2021, I know that many individuals involved in the incident used their cell phones to take photographs and videos, as well as to share them on social media applications, both during and after the incident. According to government and open source databases, BROWN previously maintained accounts on multiple social media applications, including DLive, Facebook, Twitter, Skype, and WhatsApp.  I know, based on my training and experience, that

these Internet-based applications require digital devices to operate and that photographs and videos that are posted to social media are also generally stored on the digital devices themselves.  Such evidence is therefore likely to be found on the digital devices used by BROWN.  These devices are also likely to have other evidence of BROWN's activities, including evidence of his location in the hours and days leading up to and after the Capitol Riots, Internet searches he conducted regarding the riots, and communications with other individuals regarding the riots.  These devices are also likely to have other evidence of the commission of the Subject Offenses by other rioters who were near BROWN while BROWN recorded activities at and near the Capitol.

19.  Based on my training and experience, I know that individuals typically store their digital devices, such as cell phones, tablets, and computers, at their personal residences, vehicles, and/or on their persons, where the devices can be easily accessed and used.  Moreover, in this case, on January 6, 2021, BROWN wore uniquely identifiable clothing, i.e., a black winter jacket and a black and white winter hat with the Oakley logo.  In my training and experience, individuals who engage in interstate travel to riot and damage federal property often return to their homes with the same clothing/items that they wore/used when they committed the offenses.  These items can prove that the individual shown in images captured on social media during a riot is the same person who lives at a given residence or used a particular item during the riot.

20.   In addition, in my training and experience, it is common for individuals to back up or preserve copies of digital media (such as photos and videos) across multiple devices to prevent loss.  Indeed, some companies provide services that seamlessly sync data across devices, such as Apple devices and the Apple iCloud service.  Thus, there is reason to believe that evidence of the offense that originally resided on BROWN's cell phone(s) may also be saved to other digital devices.  Moreover, as widely reported in the news media, many individuals committing the Subject Offenses posted videos, photos, and commentary about their participation in the Capitol Riots, essentially bragging about their involvement.  Based on that, there is also probable cause to believe that evidence related to these offenses may have been transferred to and stored on digital devices beyond the particular digital device BROWN possessed during the riot.

21.   Accordingly, I believe that evidence of the Subject Offenses, including digital devices and other items used by BROWN to prepare for, commit, document, and discuss the Subject Offenses, are likely to be found on BROWN's person, inside the SUBJECT RESIDENCE, and within the SUBJECT VEHICLE.

### V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

22.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units;
                                        *(footnote cont'd on next page)*

15

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remains on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently

_____

desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

23.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

      a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of

electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

24.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked

18

for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

       c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress JEFFREY SCOTT BROWN's thumbs and/or fingers on the device(s); and (2) hold the device(s) in front of JEFFREY SCOTT BROWN's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

## VI. **CONCLUSION**

25.   For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 111(a)(1), § 2 and (b) (Assaulting, Resisting or Impeding Officers and Aiding and Abetting); 18 U.S.C. § 231(a)(3), § 2 (Civil Disorders and Aiding and Abetting); 18 U.S.C. § 1752(a)(1) (Entering and Remaining on Restricted Buildings or Grounds); and 40 U.S.C. § 5104(e)(2) (Violent Entry or Disorderly Conduct) will be found at the SUBJECT RESIDENCE, on the person of BROWN, and within the SUBJECT VEHICLE, as described in Attachments A-1 through A-3.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
August, 2021.

_____
UNITED STATES MAGISTRATE JUDGE

20

**<u>ATTACHMENT A-1</u>**

<u>RESIDENCE TO BE SEARCHED</u>

The SUBJECT RESIDENCE is located at 18611 Ervin Lane, Santa Ana, CA, 92705.  The SUBJECT RESIDENCE is a single-story family residence with an attached garage and is brown with white trim.

The SUBJECT RESIDENCE includes all guesthouses, annexes, attics, porches, garages, carports, driveways, outside yard (including all sheds or storage space), mailboxes, trash containers, and debris boxes that are assigned to the SUBJECT RESIDENCE.  The SUBJECT RESIDENCE also includes all vehicles, parked in the garage or driveway of the SUBJECT RESIDENCE.



## **ATTACHMENT A-2**

PERSON TO BE SEARCHED

The person of JEFFREY SCOTT BROWN, date of birth November 10, 1966, approximately 6'5" tall and approximately 200 pounds, with brown hair and hazel eyes.  The search of JEFFREY SCOTT BROWN shall include any items on his person or within his immediate vicinity and control that are capable of containing items to be seized, including clothing pockets, digital devices, and containers (such as briefcases, backpacks, boxes, and purses).  The search shall not include a strip search or a body cavity search.



## **ATTACHMENT A-3**

PROPERTY TO BE SEARCHED

    SUBJECT VEHICLE is a gray 2021 Toyota Tacoma bearing
California license plate number 89438C3 and vehicle
identification number 3TMDZ5BNXMM105208, which is registered to
BROWN.



## ATTACHMENT B

**I.   ITEMS TO BE SEIZED**

1.   The items to be seized are the evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 111(a)(1), § 2 and (b) (Assaulting, Resisting or Impeding Officers and Aiding and Abetting); 18 U.S.C. § 231(a)(3), § 2  (Civil Disorders and Aiding and Abetting); 18 U.S.C. § 1752(a)(1) (Entering and Remaining on Restricted Buildings or Grounds); and 40 U.S.C. § 5104(e)(2) (Violent Entry or Disorderly Conduct) (collectively, the "Subject Offenses"), namely:

   a.   Evidence concerning any plans to unlawfully enter the U.S. Capitol, including any maps or diagrams of the building or its internal offices;

   b.   Evidence concerning unlawful entry into the U.S. Capitol, including any property of the U.S. Capitol;

   c.   Evidence concerning awareness of the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

   d.   Evidence concerning efforts to disrupt the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

i

e.   Evidence relating to any conspiracy to illegally enter and/or occupy the U.S. Capitol Building on or about January 6, 2021;

f.   Evidence concerning the breach and unlawful entry of the United States Capitol, and any conspiracy or plan to do so, on January 6, 2021;

g.   Evidence concerning the riot and/or civil disorder at the United States Capitol on January 6, 2021;

h.   Evidence concerning the assaults of federal officers/agents and efforts to impede such federal officers/agents in the performance of their duties at the United States Capitol on January 6, 2021;

i.   Evidence concerning damage to, or theft of, property at the United States Capitol on January 6, 2021;

j.   Evidence of any conspiracy, planning, or preparation to commit the Subject Offenses;

k.   Evidence concerning efforts after the fact to conceal evidence of the Subject Offenses, or to flee prosecution for the same;

l.   Evidence concerning materials, devices, or tools that were used to unlawfully enter the U.S. Capitol by deceit or by force, including weapons and elements used to breach the building or to counter efforts by law enforcement, such as pepper spray or smoke grenades;

m.   Evidence of communication devices, including closed circuit radios or walkie-talkies, that could have been used by co-conspirators to communicate during the unlawful entry into the U.S. Capitol;

n.   Evidence of the state of mind of BROWN and/or other co-conspirators, e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the Subject Offenses and/or the riot and civil disorder that occurred at the United States Capitol on January 6, 2021;

o.   Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation, including the Subject Offenses; or (ii) communicated with the unlawful actors about matters relating to the criminal activity under investigation, including the Subject Offenses, such as records that help reveal their whereabouts;

p.   Records, materials, and information that constitute evidence of identity, including but not limited to:

i.   clothing worn by BROWN, including a black winter jacket and a black and white winter hat with the Oakley logo; and

iii

ii.   clothing and other articles that reflect evidence of having participated in the unlawful activity at the U.S. Capitol, including evidence of pepper spray or other non-lethal crowd control remnants;

q.   Records and information — including but not limited to documents, communications, e-mails, online postings, photographs, videos, calendars, itineraries, receipts, and financial statements — relating to:

i.   Any records and/or evidence revealing BROWN's presence at the January 6, 2021, Capitol Riots;

ii.   Any physical records, such as receipts for travel, which may serve to prove evidence of travel to or from Washington D.C. from December of 2020 through January of 2021;

iii. BROWN's (and others') motive and intent for traveling to the U.S. Capitol on or about January 6, 2021; and

iv.   BROWN's (and others') activities in and around Washington, D.C., specifically the U.S. Capitol, on or about January 6, 2021;

r.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof;

s.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

    i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

    ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    iii.  evidence of the attachment of other devices;

    iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

    v.    evidence of the times the device was used;

    vi.   evidence of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of the Subject Offenses;

    vii.  evidence of BROWN's use or connection to social media accounts;

    viii. passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

    ix.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and

v

manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

          x.  records of or information about Internet
Protocol addresses used by the device;

          xi.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

    3.  As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to

store digital data (excluding analog tapes such as VHS); and
security devices.

## II.  **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location.  The search team shall
complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant.  The
government will not search the digital device(s) and/or forensic
image(s) thereof beyond this 120-day period without obtaining an
extension of time order from the Court.

b.   The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

i.   The search team may subject all of the data
contained in each digital device capable of containing any of
the items to be seized to the search protocols to determine
whether the device and any data thereon falls within the list of
items to be seized.  The search team may also search for and
attempt to recover deleted, "hidden," or encrypted data to

determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

        d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

        e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

        f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the

other items to be seized (after the time for searching the device has expired) absent further court order.

g. The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6. In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress Jeffery Scott Brown's thumbs and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of Jeffery Scott Brown's face with his eyes open to activate the facial-, iris-, or retina-recognition

x

feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| United States of America | ) | Case: 1:21-mj-00565 |
| v. | ) | Assigned to: Judge Faruqui, Zia M. |
| Jeffrey Scott Brown | ) | Assign Date: 8/16/2021 |
| | ) | Description: COMPLAINT W/ ARREST WARRANT |
| | ) | |
| | ) | |
| *Defendant* | | |

## ARREST WARRANT

To:      Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)* _____ Jeffrey Scott Brown _____ ,

who is accused of an offense or violation based on the following document filed with the court:

❑ Indictment     ❑ Superseding Indictment     ❑ Information     ❑ Superseding Information     ☒ Complaint
❑ Probation Violation Petition     ❑ Supervised Release Violation Petition     ❑ Violation Notice     ❑ Order of the Court

This offense is briefly described as follows:

18 U.S.C. §§ 111(a)(1) and (b) - Inflicting Bodily Injury on Certain Officers;
18 U.S.C. § 231(a)(3) - Obstruction of Law Enforcement During Civil Disorder;
18 U.S.C. §§ 1752(a)(1), (2) and (4) - Entering and Remaining in a Restricted Building or Grounds, Disorderly and Disruptive Conduct in a Restricted Building for Grounds, and Engaging in Physical Violence in a Restricted Building or Grounds;
40 U.S.C. §§ 5104(e)(2)(D), (E), and (F) - Disorderly Conduct in a Capitol Building, Impeding Passage Through the Capitol Grounds or Buildings, and Act of Physical Violence in the Capitol Grounds or Buildings.

Date:      08/16/2021                                                       2021.08.16 19:45:41 -04'00'

                                                                    *Issuing officer's signature*

City and state:            Washington, D.C.                    Zia M. Faruqui, U.S. Magistrate Judge
                                                                    *Printed name and title*

| **Return** |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____                              _____ |
|                                                        *Arresting officer's signature* |
|                                                        _____ |
|                                                        *Printed name and title* |

Exhibit A
Page 1 of 12

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | |
|---|---|
| United States of America<br>v.<br><br>Jeffrey Scott Brown<br>DOB: XXXXXX<br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case: 1:21-mj-00565
Assigned to: Judge Faruqui, Zia M.
Assign Date: 8/16/2021
Description: COMPLAINT W/ ARREST WARRANT

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____January 6, 2021_____ in the county of _____ in the _____ in the District of ___Columbia___ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|

18 U.S.C. §§ 111(a)(1) and (b) - Inflicting Bodily Injury on Certain Officers,
18 U.S.C. § 231(a)(3) - Obstruction of Law Enforcement During Civil Disorder,
18 U.S.C. §§ 1752(a)(1), (2) and (4) - Entering and Remaining in a Restricted Building or Grounds, Disorderly and Disruptive Conduct in a Restricted Building for Grounds, and Engaging in Physical Violence in a Restricted Building or Grounds,
40 U.S.C. §§ 5104(e)(2)(D), (E), and (F) - Disorderly Conduct in a Capitol Building, Impeding Passage Through the Capitol Grounds or Buildings, and Act of Physical Violence in the Capitol Grounds or Buildings.

This criminal complaint is based on these facts:

See attached statement of facts.

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Jessica Salo, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: ___08/16/2021___

2021.08.16
19:44:04 -04'00'
_____
*Judge's signature*

City and state: _____Washington, D.C._____

Zia M. Faruqui, U.S. Magistrate Judge
*Printed name and title*

Exhibit A
Page 2 of 12

Case: 1:21-mj-00565
Assigned to: Judge Faruqui, Zia M.
Assign Date: 8/16/2021
Description: COMPLAINT W/ ARREST WARRANT

## STATEMENT OF FACTS

Your Affiant, Jessica Salo, is a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since November 2014.  Currently, I am tasked with investigating criminal activity in and around the U.S. Capitol grounds on January 6, 2021. As a Special Agent, I am authorized by law or by a Government agency to engage in or supervise the prevention, detection, investigation, and prosecution of violations of Federal criminal laws..

The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification were allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was also closed to members of the public.

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly around 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session

Exhibit A
Page 3 of 12

of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

### FACTS RELATED JEFFREY SCOTT BROWN

During the course of the investigation into the events of January 6, 2021, law enforcement has identified communications that documented planning and coordination amongst individuals in advance of January 6, 2021.  As detailed below, the investigation has established that JEFFREY SCOTT BROWN participated in a Telegram group chat on an encrypted messaging app in the days leading up to January 6.  In the Telegram chat "about" section was the following description: "This group will serve as the Comms for able bodied individuals that are going to DC on Jan 6. Many of us have not met before and we are all ready and willing to fight. We will come together for this moment that we are called upon."

One of the members of this chat was Telegram user "JB" (UID XXXXXX1832). On January 5, 2021, at approximately 6:30 a.m. PST, Telegram user "JB" posted a picture of himself with the caption "Boarding LAX."  LAX is the airport code for the Los Angeles International Airport.



*(Picture posted by "JB" in Telegram Group "The California Patriots- DC Brigade")*

Based on my training and experience, I know that Telegram is an encrypted messaging service that is usually accessed through a smartphone application that the user downloads to his or her personal smartphone. I also know that, in order to post this photograph and message to the DC Brigade Telegram chat, BROWN must have been a member of that chat.

On March 12, 2021, I coordinated with our Los Angeles International Airport Residence Agency (LAXRA) in an attempt to identify JB. LAXRA confirmed the photo was taken in LAX Terminal 1, which is serviced by Southwest Airlines.  Based on the time that the photo was taken, law enforcement was able to review manifests for the initials "JB" and identified "JB" as JEFFREY SCOTT BROWN of Irvine, California. According to flight records, BROWN traveled from LAX to IAD (Washington, D.C.) on January 5, 2021, and returned to LAX on January 7, 2021. BROWN provided a telephone number ending in -9487 and email address jeffbrownXX@XXXXX.com on the reservation.

## BROWN IDENTIFIED IN FBI BOLO172-AFO

Based on additional investigation, in January 2021 the FBI's Washington Field Office initiated an investigation of a suspect identified as BOLO172-AFO  based on information that BOLO172-AFO was involved in the assault of numerous federal officers in and around the Lower West Terrace during the breach of the Capitol building.

On July 1, 2021, I showed the below seeking information poster and photographs of BOLO172-AFO to a WITNESS who has known BROWN for approximately four to five years. The WITNESS identified BOLO172-AFO as BROWN.

Exhibit A
Page 5 of 12



## ASSAULT ON FEDERAL OFFICERS AND VIOLENCE AT THE UNITED STATES CAPITOL

### WASHINGTON, D.C.
### JANUARY 6, 2021








Photograph #164-AFO   Photograph #165-AFO   Photograph #166-AFO   Photograph #167-AFO   Photograph #168-AFO







Photograph #169-AFO   Photograph #170-AFO   Photograph #171-AFO   Photograph #172-AFO   Photograph #173-AFO

### DETAILS

The Federal Bureau of Investigation's (FBI) Washington Field Office is seeking the public's assistance in identifying individuals who made unlawful entry into the United States Capitol Building and assaulted federal law enforcement personnel on January 6, 2021, in Washington, D.C.

Anyone with information regarding these individuals, or anyone who witnessed any unlawful violent actions at the Capitol or near the area, is asked to contact the FBI's Toll-Free Tipline at 1-800-CALL-FBI (1-800-225-5324) to verbally report tips. You may also submit any information that could be relevant online at tips.fbi.gov. You may also contact your local FBI office or the nearest American Embassy or Consulate.

When calling to provide a tip on one of these individuals, please reference the above photo number, including the AFO.

**Field Office:** Washington D.C.

www.fbi.gov

*(FBI Seeking Information Poster for BOLO164-AFO through BOLO173-AFO)*



*(Additional photographs of BOLO172-AFO at the US Capitol on January 6, 2021)*

4

Exhibit A
Page 6 of 12

In the footage from January 6, 2021, BROWN can be seen wearing a unique hat with cream/tan fleece and a black circle in the center, with a gold/tan football-shape inside of the black circle.  This hat can be seen in numerous videos/still images detailed below.

**REVIEW OF VIDEO FOOTAGE CAPTURING ASSAULTS AT U.S. CAPITOL**

On January 6, 2021, between approximately 2:56 p.m. and 3:11 p.m, a man who matches BROWN's description appeared on U.S. Capitol CCTV footage in the Lower West Terrace. Based on my training and experience, and after reviewing BROWN's California Department of Motor Vehicles photograph, I believe the man to be BROWN. And, the images in the CCTV are consistent with the person the WITNESS identified.  The Lower West Terrace Door is an outdoor area on the west side of the U.S. Capitol building. On January 6, 2021, all parts of the Lower West Terrace were considered "restricted grounds" and were not accessible to the public. The Lower West Terrace Door led into the U.S. Capitol building through a tunnel. Between approximately 2:56 p.m. and 3:11 p.m., the Lower West Terrace Door was heavily guarded by U.S. Capitol Police and MPD personnel, who had formed a defensive line to prevent unauthorized access into the U.S. Capitol via the tunnel. As BROWN moved into the tunnel, he held a cell phone up in front of his face, in a manner that indicates he was using the phone to record the events in front of him.



5

*(Screenshot of CCTV footage with BROWN entering the tunnel, phone in hand)*

At approximately 3:11 p.m., BROWN can be observed in the tunnel with a crowd of rioters, wearing the unique hat described above and depicted in the below photograph. BROWN can be seen towards the front of the group of rioters, near the police defensive line. BROWN can be seen reaching through the crowd towards another rioter, who provides BROWN with what appears to be a can of spray. At approximately 3:11 p.m., BROWN can be seen pointing the can towards the police defensive line and deploying the spray for several seconds in the direction of the police. Based on my training and experience, I assess this spray was pepper spray or a similar chemical spray.



*(BROWN deploying a can of spray in the tunnel towards the police defensive line)*

In a YouTube video titled "Scenes of Chaos Captured Inside US Capitol as Crowd Challenges Police," which I obtained on May 24, 2021, at approximately 20:05 minutes, a hand can be seen holding and deploying a can of spray irritant into crowd of officers who are attempting to restrict access to the U.S. Capitol through the exterior door to the Lower West Terrace. The spray is deployed for several seconds. The individual holding the spray is assessed to be BROWN based on the similarity in clothing and positioning to the above photograph.



*(BROWN deploying a can of spray in the tunnel towards the police defensive line)*

At approximately 21:03 minutes, BROWN was at the front of the crowd of rioters in the tunnel, participating in the pushing action against officers who were attempting to restrict access to the U.S. Capitol through the exterior door to the Lower West Terrace. During this time, a Metropolitan Police Department Officer ("Officer Victim 1") was at the front of the line of officers. This officer was being pressed between the crowd of rioters and the line of officers. His gas mask was ripped off by another individual and blood can be seen in his mouth.

On February 1, 2021, a U.S. Magistrate Judge in the District of Columbia, signed Federal Search Warrant electronic evidence account(s) associated with Gina Bisignano, based on Bisignano's presence inside the U.S. Capitol on January 6, 2021. I reviewed two videos, titled IMG_5082 and IMG_5083, which were obtained pursuant to this warrant. The videos are 7 seconds and 15 seconds long, respectively, and depict the crowd of rioters in the Lower West Terrace of the U.S. Capitol on January 6, 2021. In the videos, BROWN was at the front of the crowd participating in the pushing action against officers who were attempting to restrict access to the U.S. Capitol through the exterior door to the Lower West Terrace. According to metadata, the videos were created on January 6, 2021 at approximately 8:11:37pm UTC (3:11:48pm EST) and 8:11:48pm UTC (3:11:48pm EST).

Exhibit A
Page 9 of 12



*(BROWN at the front of the crowd of rioters participating in the pushing action against officers)*



*(BROWN at the front of the crowd of rioters participating in the pushing action against officers)*

Based on the foregoing, your Affiant submits that there is probable cause to believe that JEFFREY SCOTT BROWN violated 18 U.S.C. § 111(a)(1) and (b), which makes it a crime to forcibly assault or interfere with any person designated in section 18 U.S.C. § 1114 as an officer or employee of the United States while engaged in or on account of the performance of official duties. Persons designated within section 1114 include any person assisting an officer or employee of the United States in the performance of their official duties. Subsection (b) includes an enhancement for violating this provision while using a deadly or dangerous weapon.

Your Affiant submits that there is probable cause to believe that JEFFREY SCOTT BROWN violated 18 U.S.C. § 231(a)(3), which makes it unlawful to commit or attempt to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any

federally protected function. For purposes of Section 231 of Title 18, a federally protected function means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof. This includes the Joint Session of Congress where the Senate and House count Electoral College votes.

Your Affiant submits there is also probable cause to believe that JEFFREY SCOTT BROWN violated 18 U.S.C. § 1752(a)(1), (2) and (4), which makes it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do; and (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions; (4) knowingly engages in any act of physical violence against any person or property in any restricted building or grounds; or attempts or conspires to do so.  For purposes of Section 1752 of Title 18, a "restricted building" includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service, including the Vice President, is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance.

Your Affiant submits there is also probable cause to believe that JEFFREY SCOTT BROWN  violated 40 U.S.C. § 5104(e)(2)(D), (E), & (F), which makes it a crime to willfully and knowingly; (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; (E) obstruct, or impede passage through or within, the Grounds or any of the Capitol Buildings; and (F) engage in an act of physical violence in the Grounds or any of the Capitol Buildings.

_____
Jessica Salo
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 16th day of August 2021.

2021.08.16
19:46:37 -04'00'
_____
ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

10